# EXHIBIT NO: 5

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  EASTERN DISTRICT OF MICHIGAN
3
4  IN RE CHRISTOPHER D. WYMAN,
5  Plaintiff,
6  Civil Action: 12-32264
7  _____/
8
9  DEPONENT: MICHELLE JEAN PICHLER
10 DATE:     Tuesday, July 31, 2012
11 TIME:     1:47 p.m.
12 LOCATION: Esquire Deposition Solutions
13           2301 West Big Beaver Road
14           Troy, Michigan
15 REPORTER: Jodi L. Jones, CSR-6591

Page 2

1  APPEARANCES:
2
3  TINDALL, P.L.L.C.
4  BY: MICHAEL E. TINDALL
5  P.O. Box 48564
6  Mount Clemens, Michigan 48046
7  (313) 638-7613
8      Appearing on behalf of Barbara Duggans State Court
       Creditor Michael Mason U.S. Bankruptcy Trustee,
9
10 LAW OFFICES OF HARRIS & LITERSKI
11 BY: MATTHEW J. HARRIS
12 822 East Grand River Avenue
13 Brighton, Michigan 48116
14 (810) 229-9340
15     Appearing on behalf of Michelle Jean Pichler.

Page 3

1  TABLE OF CONTENTS
2
3  WITNESS
4  MICHELLE JEAN PICHLER                PAGE
5  EXAMINATION BY MR. TINDALL .................. 4
6
7
8  EXHIBITS
9
10 DEPOSITION EXHIBIT NUMBER 1 ............. 60
11 DEPOSITION EXHIBIT NUMBER 2 ............. 63
12 DEPOSITION EXHIBIT NUMBER 3 ............. 76
13 DEPOSITION EXHIBIT NUMBER 4 ............. N/A
14 DEPOSITION EXHIBIT NUMBER 5 ............. 80
15 DEPOSITION EXHIBIT NUMBER 6 ............. 19
16
17         (Exhibits scanned and returned to Mr.
18         Tindall.)

Page 4

1  Tuesday, July 31, 2012
2  Troy, Michigan
3  1:47 p.m.
4
5         MICHELLE JEAN PICHLER,
6  after being duly sworn to tell the truth, the whole truth and
7  nothing but the truth was examined and testified as follows:
8                     * * *
9         MR. TINDALL: Let the record reflect this is
10 the 2004 exam in the matter of In Re: Christopher D.
11 Wyman, case number 12-322-64, taken pursuant to order of
12 the bankruptcy court and subpoena issued to Ms. Pichler.
13         EXAMINATION
14 BY MR. TINDALL:
15 Q. Ms. Pichler, before we get into asking some questions,
16    I'm going to go through the list of documents that was
17    attached to your subpoena and ask if you brought any of
18    these or have any of them.
19 A. I do not have them all. I do not have bank records
20    because I ordered them back in May and then it --
21    whatever was going on then was dropped due to the
22    bankruptcy and I never received them and I didn't think
23    nothing of it. So I called them yesterday and I will be
24    getting them and they can take up to two weeks again, so
25    that's the copy that I have paid for them.

Page 33

1  A.  Possibly. I don't know the answer to that.
2  Q.  Who told you to write these checks?
3  A.  What do you mean who told me to write them?
4  Q.  I mean --
5  A.  We paid bills out of there. I mean, I wrote them to
6      him.
7  Q.  And who told you to fill the checks out this way in the
8      name of a corporation that no longer exists?
9  A.  The account, I believe, was still there.
10 Q.  But it's not made payable to a bank, it's made payable
11     to an entity, C.D. Wyman, Inc., which means somebody had
12     to endorse this check regardless of where it was put,
13     where it was deposited.
14 A.  That's -- I mean --
15 Q.  That's why I'm asking you the question who told you to
16     make these checks payable to C.D. Wyman, Inc.?
17 A.  Well, I would assume Chris if it's written to that and
18     if he had an account at First National Bank and I
19     believe it was the business account at that time.
20 Q.  Do you know what line draw means?
21 A.  What line draw means?
22 Q.  Uh-huh. One of these checks has on the memo line draw.
23 A.  I know that he had a credit line against the checking
24     account.
25 Q.  Uh-huh.

Page 34

1  A.  So it was like an overdraft protection account.
2  Q.  And property tax?
3  A.  That would be probably the property tax on the house.
4  Q.  Okay. And Lowe's?
5  A.  That would be for home repairs.
6  Q.  For home repairs?
7  A.  Uh-huh.
8  Q.  To your house?
9  A.  Uh-huh. He's -- yes. That's part of the agreement why
10     he's there. He's keeping the house up and taking care
11     of the animals out there right now.
12 Q.  And -- I'm sorry, I can't read upside down,
13     prescription, DTV?
14 A.  That is the Direct TV bill.
15 Q.  I'm sorry?
16 A.  Direct TV bill.
17 Q.  The Direct TV bill?
18 A.  Uh-huh.
19 Q.  And --
20 A.  I believe.
21 Q.  This one, glasses at Walmart?
22 A.  Yes. That was for his glasses.
23 Q.  Okay. And the other one?
24 A.  State Farm would be the car insurance.
25 Q.  On whose car?

Page 35

1  A.  My van.
2  Q.  Your van?
3  A.  Uh-huh.
4  Q.  Okay. Now, each one of these also has a series of debit
5      charges. Did you make those charges?
6  A.  Some of them I did, some are the gas. And like I said,
7      if he needed gas I would give him the card also, so I
8      mean, it's probably both of us to the best of my
9      knowledge.
10 Q.  Whose phone bill is being paid?
11 A.  That one is his.
12 Q.  Okay. All right. Who makes the web transfers for
13     deposits into this account?
14 A.  I do.
15 Q.  From what account?
16 A.  One -- I have to look at the --
17 Q.  For example, in March someone web transferred $1,200
18     into this account on the 1st of March.
19 A.  That was from me.
20 Q.  From what account did that transfer take place?
21 A.  My personal account.
22 Q.  Where?
23 A.  TCF Bank.
24 Q.  Whose name is on the account?
25 A.  Mine.

Page 36

1  Q.  Are you the only person whose name is on the account?
2  A.  Yes, sir. Uh-huh, yes, I am.
3  Q.  And are you the only signer on that account?
4  A.  Yes, I am.
5  Q.  There should have been paperwork on that as well. That
6      would be a transfer of assets to Mr. Wyman.
7  A.  We're getting the statements. I thought it was a great
8      idea to go paperless.
9  Q.  Who else made deposits into this account?
10 A.  No one that I'm aware of.
11 Q.  I'm sorry?
12 A.  No one that I'm aware of.
13 Q.  Okay. Then I take it you are the one who made the $250
14     deposit later in the month?
15 A.  Yep.
16 Q.  And where did that one come from?
17 A.  I transferred it back into my -- the account.
18 Q.  I'm sorry, transferred what back?
19 A.  Out of my account.
20 Q.  So you moved $1,200 into that account in the beginning
21     of the month and then you moved another $250 into that
22     account at the end of the month; is that right?
23 A.  Uh-huh.
24 Q.  For a total of $1,750 in one month. How much do you
25     make at --

Page 37

1  A.  Well, this date here, this was after I had the -- my ex
2      had passed away.
3  Q.  When did your ex pass away?
4  A.  In October of last year.
5  Q.  Well, this is in March of 2012.
6  A.  And that's out of my savings account.
7  Q.  That's out of your savings account. So you have both a
8      checking and savings account at TCF Bank?
9  A.  Uh-huh.
10 Q.  Okay. Can I have that back? And who made these
11     deposits in April?
12 A.  These would be mine. They are my accounts that made the
13     deposits.
14 Q.  According to the bank statement the account number that
15     you have at TCF Bank is 6883372707?
16 A.  Yes.
17 Q.  These are reference numbers --
18 A.  Shows me.
19 Q.  -- usually associated with deposit tickets.
20 A.  Well, these right here, though, it shows -- wait a
21     minute. They did have my account number on some of them
22     that's why I'm -- but I believe this is my savings
23     account number. I'd have to look, but I guess they are
24     all different.
25 Q.  They are all different.

Page 38

1  A.  So that's, I mean, that's where it came from usually is
2      when I transferred them.
3  Q.  Well, how many savings accounts do you have?
4  A.  One. That's what I'm saying, I don't understand what
5      the numbers are.
6  Q.  Okay. But you feel pretty confident that you made all
7      these deposits?
8  A.  I believe I did. Am I a hundred percent sure? No.
9  Q.  What is your -- how are you paid over at Grasshopper
10     Gardens?
11 A.  Every two weeks.
12 Q.  By the hour, are you on salary?
13 A.  Hourly.
14 Q.  And what is your hourly pay rate?
15 A.  Do I have to disclose that?
16 Q.  Yes, you do.
17         MR. HARRIS: Yes.
18 A.  Twelve.
19 BY MR. TINDALL:
20 Q.  $12 an hour?
21 A.  Uh-huh.
22 Q.  And your usual work week is what?
23 A.  Forty-five to 50 hours a week.
24 Q.  Okay.
25 A.  And I also receive Social Security for my daughter.

Page 39

1  Q.  So you gross about $510 a week?
2  A.  Approximately.
3  Q.  That would be $2,000 a month. And how much Social
4      Security per month do you get for your daughter?
5  A.  It's over 1,500.
6  Q.  And do you have any other receipts?
7  A.  No. I can't think of right now.
8  Q.  Have you shared an account that Mr. Wyman has had access
9      to whether he was on it or not --
10 A.  Just that one.
11 Q.  -- at any other bank?
12 A.  No. I don't believe I have. There was a time when he
13     had -- I was a signer on the one account but then I took
14     it off. On his First National Bank one time years back
15     when -- years ago. It was 2006, '07, somewhere in there
16     I worked at the office.
17 Q.  At his office?
18 A.  Uh-huh.
19 Q.  Okay. That would be, well, still wouldn't be C.D.
20     Wyman, Inc. because that went out of business 2004,
21     July 15th, so what was the business at that time?
22 A.  That's what it was as far as I know.
23 Q.  So you are saying --
24 A.  I don't recall the dates. I'd have to go back and look.
25     I don't recall the dates, but I was a signer on one

Page 40

1      account at First National Bank, but then I took -- I
2      didn't sign anymore, I took the thing off.
3  Q.  And you don't remember when?
4  A.  No, I don't remember the dates.
5  Q.  And where is this office that you worked at?
6  A.  It was the 6241 Grand River.
7  Q.  So that would be Ms. Gentry's office?
8  A.  Uh-huh, years ago.
9  Q.  Were you full time employed at this time?
10 A.  No.
11 Q.  What -- how many hours did you work there?
12 A.  I can't even recall.
13 Q.  So you can't recall when, you don't know how many hours
14     you worked --
15 A.  It was just part time. It wasn't like a full time job.
16     I don't recall how many hours a week I was working then.
17 Q.  What did you do?
18 A.  I was a receptionist at one point.
19 Q.  And how long did this occur?
20 A.  This was probably maybe six months.
21 Q.  For six months, okay. And you were out of -- I presume
22     you were out of work at your other location?
23 A.  Uh-huh.
24 Q.  Laid off or what?
25 A.  Uh-huh. Actually that was before I even started there

Page 81

1 A. This was in my files that I found the stuff that I had.
2 Q. Okay. That tells me where you found it. Where did you
3     get it?
4 A. I don't recall.
5 Q. The reason I ask that question is because if you look at
6     the right-hand side of this document it was not sent to
7     you after it was supposed to be recorded. It was to be
8     sent to Mr. Wyman, that would be over here. See here,
9     it says --
10 A. Okay.
11 Q. -- when recorded return to Wyman?
12 A. Uh-huh.
13 Q. The bottom section, right here where there is a check
14     mark.
15 A. Okay.
16 Q. Okay. So I guess I'm wondering where would you have
17     gotten a copy of this document?
18 A. Probably when we were living in the same house, I would
19     imagine.
20 Q. But you don't know?
21 A. I don't recall, no.
22 Q. Do you know -- you did not record this document, did
23     you?
24 A. I don't think so. I don't recall.
25 Q. Well, it's not a surprise because Mr. Wyman did. He

Page 82

1     already testified to that. Do you know why this
2     document wasn't recorded until 2012, the very day
3     Mr. Wyman was going to court?
4 A. I do not.
5 Q. Do you know when you first saw this document?
6 A. I don't recall.
7 Q. Pardon me?
8 A. I don't recall.
9 Q. Were you told by anyone that this document was going to
10     be recorded?
11 A. No.
12 Q. Well, then I guess my question is this: You signed a
13     land contract, you don't recall ever seeing this
14     document, the next day you sign a mortgage as if you
15     have title to this property but the document that has
16     that title was never recorded and wasn't, according to
17     you, I mean, wasn't even in your possession at that
18     time. Can you explain how all this makes any kind of
19     sense?
20 A. I cannot.
21 Q. I'm going to give you your originals back so that -- and
22     please check them -- please check them to make sure that
23     there's none missing.
24 A. None missing?
25 Q. Yeah, just to make sure they didn't get mixed up with

Page 83

1     any of the other papers.
2 A. They don't have the stamps?
3 Q. Well, they are your documents, I suspect you would
4     recognize what's original and you know what you brought,
5     right? Now, Ms. Pichler, did you discuss your -- did
6     you discuss your testimony here today with anyone
7     besides your attorney before you came here?
8 A. No, I did not.
9 Q. When was the last time you met with Mr. Wyman?
10 A. I talked to him briefly a couple weeks ago about the
11     house maybe. It was because I stopped over there and he
12     was there.
13 Q. Have you spoken to him by phone or by any other method?
14 A. Occasionally I do, just because of the house because
15     he's there with the animals and -- but nothing as far as
16     this was discussed.
17 Q. Since that last time a couple of weeks ago have you
18     spoken to him by phone?
19 A. I'm sure I have.
20 Q. But you can't recall when?
21 A. I don't know what day it was.
22 Q. Previously said you haven't spoken to Mr. --
23 A. Well, I mean, I -- because of the house I talk to him
24     periodically, I don't -- that's it.
25 Q. You previously said you haven't spoken to Mr. Linck in

Page 84

1     some time.
2 A. Mr. Linck is different that Mr. Wyman.
3 Q. I understand, that's why I'm asking the question. Have
4     you spoken to Mr. Linck about your visit here today?
5 A. No, I have not.
6 Q. When was the last time you spoke to him?
7 A. I think the last time was when I saw him in court in
8     Howell.
9 Q. May 2nd?
10 A. What day that was I don't recall.
11 Q. When was the last time you spoke to Ms. Gentry?
12 A. Approximately a week ago, I think.
13 Q. And did you --
14 A. We don't discuss any of this.
15 Q. You have not discussed this, you have not discussed the
16     bankruptcy, you have not discussed Mr. Wyman at all?
17 A. We have not, no.
18 Q. I think that will do it. I'm going to not end this
19     examination, I'm going to continue it over because I may
20     need to ask you questions about some of the documents
21     you haven't produced today.
22 A. Okay.
23 Q. All right? When we continue it over what that means is
24     the examination has not ended.
25 A. Okay.



Page 85

1 Q. It means that if I look at the documents your attorney
2 provides and I need to ask you more questions, then
3 we'll have you back to answer those questions and you'll
4 still be under oath, penalties of perjury and all that
5 good stuff and then we'll finish.
6 A. Okay.
7 Q. If it turns out I don't need to did that after your
8 attorney gives me those documents, then we won't and you
9 won't have to come back again.
10 A. Okay.
11 Q. Okay?
12 A. Okay.
13     MR. TINDALL: Off the record.
14     (The examination adjourned at 3:45 p.m..
15     Signature of the witness was not requested by
16     respective counsel.)

Page 86

1     CERTIFICATE OF NOTARY
3 STATE OF MICHIGAN )
4     ) ss
5 COUNTY OF OAKLAND )
6     I, Jodi L. Jones, a Notary Public in and for the
7 above county and state, do hereby certify that the above
8 deposition was taken before me at the time and place
9 hereinbefore set forth; that the witness was by me first duly
10 sworn to testify to the truth, and nothing but the truth; that
11 the foregoing questions asked and answers made by the witness
12 were duly recorded by me stenographically and reduced to
13 computer transcription; that this is a true, full and correct
14 transcript of my stenographic notes so taken; and that I am
15 not related to, nor of counsel to either party nor interested
16 in the event of this cause. I hereto set my hand this Monday,
17 April 1, 2013.

    *Jodi L. Jones* (signature)

20     Jodi L. Jones, CSR-6591
21     Notary Public,
22     Oakland County, Michigan
23   My Commission expires: September 14, 2013

